## TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS *v.* BROTHERHOOD OF RAILROAD TRAINMEN ET AL.

No. 218.   Argued December 15, 16, 1942.—Decided January 18, 1943.

*Mr. Bruce A. Campbell,* with whom *Messrs. Rudolph J. Kramer, Arnot L. Sheppard, Louis A. McKeown, Carleton S. Hadley,* and *Walter N. Davis* were on the brief, for appellant.

*Messrs. William C. Wines,* Assistant Attorney General of Illinois, and *Alvin E. Stein,* with whom *Mr. George F. Barrett,* Attorney General, was on the brief, for appellees.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Appellant is a corporation engaged in performing terminal services and furnishing terminal facilities in and about East St. Louis, Illinois, to a number of railroad companies which share its ownership and control. It operates several yards for the sorting and classification and interchange of cars, with some service to industries within the switching district.

The Brotherhood of Railroad Trainmen, one of the appellees, representing trainmen and switchmen employed by appellant, complained to the Illinois Commerce Commission of appellant's failure to provide caboose cars for its employees. In answer the appellant denied that the Commission had power to enter any order that would relate to movements in interstate commerce, which it said included substantially all of its operations; and it contended further that it had already provided all reasonably necessary facilities. The issues were sharply contested before the Commission, and the evidence, while it may not have required, certainly permitted these conclusions:

Appellant's switching crews make and break up trains of cars and deliver and transfer them. One man of each crew is required to ride the rear car of the train when it is in motion. Depending upon the distances by which fixed

structures along the track clear this car, he rides its top or side, and in some places both top and side clearances are so small that he must ride on the drawbar projecting from the end of the car. Sudden jerks and stops are common and they have on occasion thrown off switchmen. The duties of the rear switchman include lining switches into position after the train has passed and watching street and highway crossings to protect the public when the train is backing up. In cases of emergency he must stop the train by turning an air valve located next to the drawbar, which he cannot readily or safely do if he is riding on the top or side of the car.

During some seasons of the year he is exposed to rain, sleet, snow and ice, which also cover the parts of the car to which he must cling to stay on it, thus adding to his difficulties.

Appellant's trains, when not equipped with cabooses, have no storage space for safety devices, flagging equipment, or for extra clothing, lunches and drinking water of the men; and they provide no space in which the men can perform their clerical duties.

The Commission found that by providing cabooses the appellant could eliminate the necessity for the rear switchmen to ride the tops, sides, or draw-bars of the rear cars; afford safe and ready access to the air valve; and provide space for storage and for clerical work. It found that it was essential to the health, safety, and comfort of the rear switchmen that the appellant provide cabooses on all of designated runs in so far as they were within the confines of the State, and made its order accordingly. The order was sustained by the Supreme Court of Illinois as "obviously promulgated to protect the lives and health of citizens of this State engaged in appellee's business within the State," and as not imposing an un-

4

lawful burden upon interstate commerce.[1] The case is here on appeal.[2]

All but an insignificant number of the cars in the trains on the specified runs move in interstate commerce, so that the order pertained to a matter clearly within the power of Congress to regulate interstate commerce.

Appellant claims that there had been Congressional occupation of the field by virtue of the Boiler Inspection Act,[3] the Safety Appliance Act,[4] and the Interstate Commerce Act.[5] It is not contended, nor do we understand, that these statutes, by themselves and unimplemented by any action of the Interstate Commerce Commission, lay down any requirement that cabooses shall or shall not be used on any of the runs in question. Nor is it contended that the Interstate Commerce Commission itself has sought to make any such requirement. At least in the absence of such action these Acts do not themselves preclude the state order, *Atlantic Coast Line* v. *Georgia*, 234 U. S. 280; cf. *Welch Co.* v. *New Hampshire*, 306 U. S. 79, and it is unnecessary to consider on this occasion and without the participation of the Interstate Commerce Commission what may be the extent of its power under these Acts. If it should in the exercise of granted power determine whether appellant must provide cabooses, the State would be powerless to gainsay it. This and no

---

[1] 379 Ill. 403, 41 N. E. 2d 481.

[2] § 237 (a) of the Judicial Code, 28 U. S. C. § 344 (a).

[3] 45 U. S. C. §§ 22–34.

[4] 45 U. S. C. § 1 *et seq.*

[5] 49 U. S. C. § 1 *et seq.* Particular reliance is put upon paragraphs (10), (11), (13), (14), (15), (16), (17), and (21) of § 1, relating to the Commission's powers in respect to car service; and upon paragraph 2 of § 20 (a), relating to its powers over the issuance of securities and the assumption of liabilities thereon. We have not been informed whether such issuance or assumption is needed to obtain the cabooses which the Illinois Commission has ordered to be used.

more is the effect of *Pennsylvania R. Co.* v. *Public Service Commission,* 250 U. S. 566.

The Railway Labor Act,[6] also relied upon by appellant, remains for consideration and presents questions of a different order, not heretofore examined in any opinion of this Court.[7] The purpose of this Act is declared to be to provide "for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions"; and "for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." [8] It places upon carriers and employees the duty of exerting every reasonable effort to settle these disputes by agreement, and prohibits the carrier from altering agreed rates of pay, rules, or working conditions except in the manner provided by the agreement or by the Act itself.[9] Machinery is set up for the adjustment, mediation, and arbitration of disputes which the parties do not succeed in settling among themselves.[10] The First Division of the National Railroad Adjustment Board has jurisdiction over disputes involving train and yard-service employees of carriers, which may be referred to it by agreement of both parties or by either party.[11] Its awards are made "final and binding" upon both parties to the dispute [12] and the carrier may be required by the courts to comply, the Board's findings being, in a proceeding for such purpose, prima facie evidence of the facts therein stated.[13]

---

[6] 45 U. S. C. § 151 *et seq.*

[7] Cf. *Missouri Pacific R. Co.* v. *Norwood,* 283 U. S. 249, 258.

[8] 45 U. S. C. § 151a.

[9] 45 U. S. C. § 152, paragraphs 1 and 7.

[10] 45 U. S. C. § 153 *et seq.*

[11] 45 U. S. C. § 153 (h) (i); see also § 155.

[12] 45 U. S. C. § 153 (m).

[13] 45 U. S. C. § 153 (p).

6

The order before us is the outgrowth of a dispute between the carrier and its employees. The contract between the appellant and the Brotherhood contains provision for cabooses for certain trains and services, but does not provide for those ordered by the Illinois Commission. We assume, without deciding, that the demand for additional caboose service and its refusal constitute a dispute about working conditions, and that the National Railroad Adjustment Board would have jurisdiction of it on petition of the employees or their representative and might have made an award such as the order in question or some modification of it. The question is whether the Railway Labor Act, so interpreted, occupied the field to the exclusion of the state action under review. We conclude that it does not, and for the following reasons:

The Railway Labor Act, like the National Labor Relations Act,[14] does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. So far as the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions. The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce. The Mediation Board and Adjustment Board act to compose differences that threaten continuity of work, not to remove conditions that threaten the health or safety of workers. Cf. *Pennsylvania R. Co.* v. *Labor Board*, 261 U. S. 72, 84.

State laws have long regulated a great variety of conditions in transportation and industry, such as sanitary

---

[14] 29 U. S. C. § 151 *et seq.*

facilities and conditions, safety devices and protections, purity of water supply, fire protection, and innumerable others. Any of these matters might, we suppose, be the subject of a demand by workmen for better protection and upon refusal might be the subject of a labor dispute which would have such effect on interstate commerce that federal agencies might be invoked to deal with some phase of it. But we would hardly be expected to hold that the price of the federal effort to protect the peace and continuity of commerce has been to strike down state sanitary codes, health regulations, factory inspections, and safety provisions for industry and transportation. We suppose employees might consider that state or municipal requirements of fire escapes, fire doors, and fire protection were inadequate and make them the subject of a dispute, at least some phases of which would be of federal concern. But it cannot be that the minimum requirements laid down by state authority are all set aside. We hold that the enactment by Congress of the Railway Labor Act was not a preëmption of the field of regulating working conditions themselves and did not preclude the State of Illinois from making the order in question.

We must decide the question of state power in this case in the absence of any Act of Congress that conflicts with the order or may be said to occupy its field.

The order of the State Commission requires that cabooses be used on appellant's trains making runs of two different sorts. Runs of the first sort are made by trains which, although they begin and end and make their entire movements within the State, are made up almost entirely of cars moving in interstate commerce. Runs of the second sort are made by trains which move between points in East St. Louis, Illinois, and St. Louis, Missouri, and cross one or the other of two bridges spanning the Mississippi River and the state line. On its face the order requires only that cabooses be used within Illinois, and

does not require that they be used in Missouri. Appellant contends, and we assume, however, that there do not exist, and that it is not reasonably practicable to install, facilities for taking on and dropping off cabooses at the points where the trains cross the state line; and that the practical consequence of the order is that if cabooses are to be used in Illinois on runs of the second sort they must also be used at least as far as the nearest switching point in Missouri.

As to both classes of runs, the effect of the order is in some measure to retard and increase the cost of movements in interstate commerce. This is not to say, however, that the order is necessarily invalid. In the absence of controlling federal legislation this Court has sustained a wide variety of state regulations of railroad trains moving in interstate commerce having such effect.[15] The governing principles were recently stated in *Parker* v. *Brown*, 317 U. S. 341, 361–363.

We are of opinion that under these principles the order is valid as to runs of both sorts. It finds its origin in the local climatic conditions and in the hazards created by particular local physical structures, and it has rather obvious relation to the health and safety of local workmen. The record in the case does not afford a sure basis for calculating the costs to commerce resulting from the order against the costs to the safety and health of the workmen which it was intended to minimize, and there is evidence in the case that nearby railroads have seen fit in the absence of legal compulsion to provide cabooses in circumstances substantially similar to those upon which appellant relies to establish absence of state power.

If lack of facilities at the state line requires as a practical matter that in order to provide cabooses in Illinois appellant must also provide them for some distance in Missouri, that fact does not preclude Illinois from regulating the

---

[15] See cases cited in *California* v. *Thompson*, 313 U. S. 109, 113–114.

operation to the limits of its territory. *Missouri Pacific Ry. Co.* v. *Kansas,* 216 U. S. 262; cf. *South Covington & C. S. Ry. Co.* v. *Covington,* 235 U. S. 537.[16]

The judgment of the court below is

*Affirmed.*

---

[16] This case involved a street-car line running between Covington, Kentucky, and Cincinnati, Ohio, over a bridge connecting the two cities. The City of Covington required that: (1) passengers must not ride on car platforms unless the platforms were equipped with suitable rails and barriers; (2) the cars must be kept clean, ventilated and fumigated; (3) the temperature of the air in the cars must never fall below a stated minimum; (4) in practical effect, that additional cars must be run in Cincinnati as well as in Covington in excess of the Cincinnati franchise rights and in such manner as to make probable the creation of serious impediments to other traffic in Cincinnati and conflict with Cincinnati regulations. The first two requirements were sustained. The third was struck down because the opening and closing of the car doors made compliance impossible; the fourth, because of the likelihood that serious burdens would be imposed upon interstate commerce by virtue of the impossibility of compliance with probable conflicting regulations. These factors have not been shown to exist in the present case.