### In re CHICAGO NORTH SHORE & M. R. CO.

### BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al. v. CHICAGO NORTH SHORE & M. R. CO. et al.

### No. 8672.

Circuit Court of Appeals, Seventh Circuit.

March 2, 1945.

Writ of Certiorari Denied April 30, 1945.
See 65 S.Ct. 1089.

Leo J. Hassenauer and Everett L. Gordon, both of Chicago, Ill., for appellants.

Ralph R. Bradley and Frederick E. Stout, both of Chicago, Ill., for appellees.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, *Circuit Judge*.

The debtor, Chicago North Shore & Milwaukee Railroad Company, originally in receivership and now in bankruptcy, is an electric railroad operating between Chicago, Illinois, and Milwaukee, Wisconsin. Prior to 1919, it had no means of entering the city of Chicago. March 31, 1919, it entered into an agreement with the predecessor of the Chicago Rapid Transit Company, permitting North Shore to operate its trains into Chicago over the tracks of Rapid Transit subject to the control and regulations of Rapid Transit, which furnishes the local intrastate elevated railway service in Chicago. In the agreement the predecessor of Rapid Transit reserved the right to adopt and impose rules, orders, and regulations for the operation of all trains over the tracks and to govern the performance of the duties of all employees employed in connection with the property jointly used. This agreement was approved by the Illinois Public Utilities Commission (now Illinois Commerce Commission). After 1919, additional contracts were made with the approval of the Commission, under which North Shore operations over Rapid Transit tracks were extended as far south as 63rd Street. In 1938, with the Commission's approval, operations south of Roosevelt Road were abandoned.

Shortly after March, 1919, Division 900 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America became the bargaining agent for the organized employees of North Shore and continued to represent them until March 4, 1942. In the interval, there was considerable litigation whether North Shore was a carrier subject to the

Railway Labor Act, 45 U.S.C.A. § 151 et seq. The litigation determined that North Shore was subject to the Act. Sprague v. Woll, 7 Cir., 122 F.2d 128. Beginning October 27, 1941, the National Mediation Board conducted proceedings to determine a representation dispute involving Division 900 and appellants, who claimed to represent motormen, conductors, brakemen, switchmen and switch tenders, all employees of North Shore. At that meeting one of the members of the Board made the announcement that a notice of the hearing had been sent to the carriers, not, however, with the intention of making the carrier a party to the proceedings, but with the end in view of having the carrier's representative present at the invitation of the Board, to present such evidence and testimony as might be helpful in enabling the Board to solve the issues in question. The hearing was attended by one of the receivers for North Shore and he was called as a witness by the Board. February 9, 1942, the Board rendered its opinion and directed that a secret ballot be taken to settle the representation dispute. The election was conducted by the Board on February 27, 1942, and on March 4, 1942, appellants were certified as the bargaining agents.

On February 6, 1942, the receivers for North Shore filed with Judge Igoe, before whom proceedings involving both railroads were pending, a report in this case, advising the court of the proceedings before the Board and reciting that the receivers had received a notice from Division 308 of the Amalgamated Association, representing employees of Rapid Transit, that on and after February 1, 1942, the members would not associate themselves nor participate in the operation of North Shore trains. February 14, 1942, the receivers filed a supplemental report in which they suggested that "a change in crews on North Shore trains at a convenient point near the junction of the North Shore Road and elevated lines be made."

Late in the afternoon of February 14, Judge Igoe issued an invitation to the representatives of the employees to attend a conference in his chambers on Sunday, February 15. At this meeting representatives of North Shore and Rapid Transit, as well as Division 308 of the Amalgamated Association and appellants, were represented. Considerable discussion of the controversy took place and ample opportunity was given to all to state their position in the matter.

It also appears that on January 9, 1942, Division 308 of the Amalgamated Association, representing a majority of employees of Rapid Transit, met with the trustees of that company and informed them that at some time in the future the members of Division 308 would notify the trustees that Rapid Transit employees would no longer associate themselves or participate in the operation of North Shore. Thereupon, the trustees called upon the District Judge and reported to him the remarks of Rapid Transit union representatives, and it was decided that counsel for the receivers should apprise various government officials of the possibility of future interruption of transportation service. January 12, 1942, counsel for the receivers met with representatives of the 'Office of Defense Transportation and the Director of the Conciliation Division of the Department of Labor, and informed them of the situation.

On January 31, 1942, Division 308 notified Rapid Transit trustees that from and after 5 a. m. February 1, 1942, its members would not associate themselves nor participate in the operation of North Shore trains. The next morning, when the first North Shore train was ready to leave the lay-up track near Roosevelt Road, the Rapid Transit towerman refused to throw the switch and give the signal to permit the regular North Shore train to proceed. The towerman was immediately discharged. Similar incidents occurred at the north end with respect to trains Chicago bound. In order to avoid a tie-up of Rapid Transit operations which would also prevent the operation of North Shore military trains, it was necessary for the trustees of Rapid Transit to re-employ the Rapid Transit towerman. No North Shore regular trains operated into or out of Chicago from February 1, 1942, until February 18, 1942, although military trains were permitted to operate.

On February 18, 1942, formal orders were entered, one in the Rapid Transit bankruptcy reorganization proceeding and one in the case before us, directing that "pending adjustment of the jurisdictional labor difficulty" temporary operation was to be had "on the basis of change of crews at Howard Street, and that the North Shore cars south of Howard Street be operated by Rapid Transit crews * * *."

On February 20, 1942, after notice to the interested parties including appellants, a proposed contract to amend the original

operating contracts covering operation of North Shore trains by Rapid Transit crews was presented by the receivers of North Shore and by the trustees of Rapid Transit in their respective court proceedings which the court approved, and, subsequently, the Illinois Commerce Commission also approved the contract.

It also appears that shortly after appellants were certified as bargaining agents they informed the receivers of North Shore that until further notice they would continue to work under the collective bargaining agreement obtained by Division 900, but subsequently they served notice under the provisions of section 6 of the Railway Labor Act of an intended change in the agreement. North Shore and appellants were unable to agree on a new contract and an Emergency Board was appointed by the President of the United States. The Emergency Board, in its report to the President, found that it was without right under the Railway Labor Act to decide the issue. On August 9, 1943, appellants obtained leave to intervene and moved to set aside the order of February 18, 1942. The issues were referred to a master. He heard the evidence and filed his report in which he found the facts from which he concluded that the order providing for the operation of North Shore thereunder was of interest to the public and the National War effort; that at the entry of the order no dispute existed between North Shore and its employees; that no change of conditions or facts existed warranting the court in vacating the order; that the order did not violate any of the provisions, or change rates of pay, rules, or working conditions contrary to the Railway Labor Act; that the change of crews effected by the order involved inter-corporate operational rights of a junior carrier using the facilities of a senior carrier; and that neither a written agreement between North Shore and its employees nor long continued practices as to the manning of North Shore trains by North Shore employees between Howard Street and Roosevelt Road could deprive Rapid Transit of the right to make, alter, or refuse agreements to other carriers using or desiring to use its tracks or from exercising the supervision and control it had reserved to itself as the senior road.

The District Court adopted the master's findings, overruled exceptions and objections to the report, and entered an order denying and dismissing the motion to vacate the order of February 18, 1942. From that order, this appeal is prosecuted.

Before we proceed to a discussion of the contentions of the parties, it is well to keep in mind that there was here no interference by appellees or by the court with the representation dispute on North Shore concerning the question as to who should represent North Shore employees. The controversy which brought about the interruption of movement of North Shore trains over Rapid Transit tracks and the entry of the order appealed from was between Rapid Transit employees, who were members of Division 308 of Amalgamated Association, and North Shore employees, who were members of appellants' organizations.

Appellants, claiming that the employees of North Shore were covered by the agreement that had been secured by Division 900 of the Amalgamated Association providing that all working conditions were to remain in force unless changed by mutual agreement, contend that the order of February 18, 1942, constitutes a change in the agreement, and they argue that no change can be validly accomplished without giving thirty days' notice in writing and following subsequent procedural processes as required by the Railway Labor Act, 44 Stat. 577, 45 U.S.C.A. § 151 et seq.

To be sure, the Act is aimed at the settlement of industrial disputes by the promotion of collective bargaining and by mediation when such bargaining does not result in agreement, Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 553, 57 S.Ct. 592, 81 L.Ed. 789, and Section 2 (seventh) of the Act, 45 U.S.C.A. § 152 Seventh, provides in part that no carrier shall change the working conditions of its employees except in the manner prescribed in any agreement existing between the carrier and its employees or in section 6, 45 U.S.C.A. § 156, of the Act. True, a failure of a carrier to proceed as provided by the Act leaves the agreement in force, Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, and no wage cut may be imposed unless the provisions of the Act are first obeyed, Burke v. Morphy, 2 Cir., 109 F.2d 572. But we think that the cases just cited and the case before us are too different in fact for them to control our case. In those cases the question of wages was a subject which rested between the defendants and their employees.

In our case there is no contention that the Act is not applicable to the North Shore and its employees in their dealings with one another or that North Shore is excused from complying with the terms of the Act where its provisions apply. Appellees' contention is that the method and manner of operating its trains on Rapid Transit tracks was the subject of inter-corporate agreements between Rapid Transit and North Shore, and that the Act does not constitute a vehicle for the settlement of disputes between employees of a local intrastate railway not subject to the Act and the employees of an interstate carrier.

While it is true that at the time Rapid Transit took over the operation of the trains there was in existence between North Shore and its employees an agreement covering wages, rules and working conditions, the agreement did not designate any particular point on Rapid Transit tracks in Chicago as a terminal, or any point from or to which North Shore employees would operate the North Shore trains; and, as we have already observed, the agreement permitting North Shore to operate its trains over the tracks of Rapid Transit, reserved to Rapid Transit the right to adopt and impose regulations for the operation of all trains over the tracks.

The Act does not undertake governmental regulation of working conditions, Terminal Railroad Association v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 6, 63 S.Ct. 420, 87 L.Ed. 571, nor have we been able to find in the Act an intention to exclude a State from exercising its police power or the right to approve or disapprove the terms and conditions upon which one carrier might allow another carrier to use the former's property or facilities.

The Illinois Public Utility Act contemplates actual supervision of every public utility so that continuous, adequate, uniform satisfactory service shall be rendered to the public, City of Chicago v. Alton R. R. Co., 355 Ill. 65, 74, 188 N.E. 831, and requires that intercorporate contracts providing for the use by one rail carrier of tracks and facilities of another carrier be approved by the Illinois Commerce Commission. Ill.Rev.Stat.1943, Chap. 111⅔, § 27.

The phrase "working conditions" means such conditions affecting the work of the employees as might be the subject of agreement between North Shore and its employees, Missouri Pac. R. Co. v. Norwood, D.C., 42 F.2d 765, 773, affirmed, 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010. The Act does not fix or authorize anyone to fix generally applicable standards for working conditions, and the term "working conditions" does not include any and all circumstances concerning work required of employees. It does not exclude a State from exercising its police power. Terminal Railroad Ass'n v. Brotherhood of Railroad Trainmen, supra, 318 U.S. 6, 63 S.Ct. 420, 87 L.Ed. 571.

We conclude that under the circumstances appearing in the case, the operation of North Shore trains on Rapid Transit tracks by Rapid Transit crews was not such a change in working conditions as is contemplated in the Railway Labor Act, but constituted a change in the intercorporate operating arrangements between the two companies.

The order of the District Court is affirmed.