INTERNATIONAL WOODWORKERS OF AMERICA, LOCAL 6–64, CIO
v.
McCLOUD RIVER LUMBER CO. et al.
No. 6398.

United States District Court,
N. D. California, N. D.
April 29, 1953.

Jay A. Darwin, San Francisco, Cal., for plaintiff.

Littler, Coakley & Lauritzen, San Francisco, Cal. for defendant.

Clifford R. Lewis and Kenneth McGilvray, Sacramento, for intervenor.

LEMMON, District Judge.

Whether the parties meant what they said when they called the augmentation in pay a "wage increase", to be used by the consenting employees in furtherance of a Health and Welfare Plan—

Whether the instrument at bar should be reformed so as to delete the provision that each employee must specifically agree in writing before this "wage increase" can be thus applied as to him—

These are the two crucial questions here presented to the Court for solution.

Implicit in those two problems are some others:

To what extent should the Court disregard the plain language of the parties, who have been dealing at arms' length without proof of any overreaching on either side?

If the plain words in the document before this Court do not mean what the parties intended them to mean, Talleyrand was indeed correct in his cynical aphorism that language is designed to conceal thought!

Can the employee-authorization provision in the agreement be cut without causing the entire instrument to bleed?

Is this a case where the reformation of an agreement is merely a refuge for the improvident?

1. The Stipulation.

The record in this case consists of a Court-approved Pre-Trial Stipulation with exhibits attached and of testimony adduced at the trial. The testimony will be referred to hereinafter.

The pertinent facts contained in the stipulation may be summarized as follows:

The main action and the defendant's counterclaim are brought pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202, pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185, and by reason of the Federal statutes conferring jurisdiction upon this Court on the basis of diversity of citizenship. The intervener has been permitted to intervene by order of the Court dated July 18, 1951.

The plaintiff is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 152, and at all times herein mentioned has been the collective bargaining representative for employees of the defendant covered by the collective bargaining agreements, infra.

The defendant is a corporation organized under the laws of Minnesota, and at all times herein mentioned has been doing business and operating as a foreign corporation in Siskiyou County, California. The defendant is engaged in the logging and lumber industry and is engaged in "commerce" within the provisions of Section 2(6) of the National Labor Relations Act, as amended.

On or about May 21, 1948, the plaintiff and the defendant entered into a collective bargaining agreement covering production and maintenance employees, with certain exclusions, in the defendant's plant at McCloud, California. On or about May 29, 1948, the plaintiff and the defendant entered into a collective bargaining agreement covering production and maintenance employees, with certain exclusions, in the defendant's logging operation. On or about August 21, 1948, the same parties entered into a like agreement covering certain employees in the defendant's town operations at McCloud.

By the above agreements, the defendant at all times recognized the plaintiff as the exclusive bargaining agent for the employees covered thereby, for the purpose of collective bargaining as to rates of pay, hours of employment, or other working conditions, within the means of Section 9(a) of the National Labor Relations Act, as amended.

On or about January 25, 1950, the defendant received written demands from the plaintiff concerning proposals for revision and amendment of the agreements referred to above. These proposals involved the establishment of a Health and Welfare Plan and certain paid holidays.

For a number of years prior to 1950, it had been the custom of the plaintiff to appoint the Northwest Regional Negotiating Committee of the International Woodworkers of America, CIO, hereinafter referred to as the Northwest Committee, to represent it in collective bargaining. Likewise, it had been the custom of the defendant to appoint Pine Industrial Relations Committee, Inc., hereinafter referred to as "PIRC", to represent it in collective bargaining negotiations, which, however, have never been binding upon either of the two principal parties herein. Such negotiations ordinarily result in joint recommendations, which the said parties may accept, reject, or modify.

The matters set forth in the following thirteen numbered paragraphs, are not within the direct knowledge of the defendant, but it admits that if the plaintiff had produced witnesses at the trial they would have testified substantially to the matters therein alleged:

1. In the Pacific Northwest, there are more than 100 local unions chartered by the International Woodworkers

of America, hereinafter referred to as "IWA-CIO", which represent employees in the lumber industry and which have collective bargaining agreements, covering approximately 40,000 employees, with employers engaged in that industry. These agreements are generally subject to renewal, termination or modification on April 1 of each year, on 60 days' notice prior to that date by either party. It has been the practice for these local unions to delegate to the Northwest Committee authority to represent them in negotiations for modifications that they desire to have applied uniformly throughout the area affected. The program of negotiations followed by the Committee is formulated by a "broad conference" of delegates elected by the local unions. Each spring, the Northwest Committee has negotiated with various employers' associations, and also with various independent employers that are not represented by any such association. The largest of the employer associations is the Lumberman's Industrial Relations Committee, hereinafter referred to as "LIRC", and the second largest is the Willamette Valley Lumber Operators Association (WVLOA), PIRC, of which defendant is a member, represents employers in Southern Oregon and Northern California. The settlements reached each year have been subject to approval by the local unions represented by the Northwest Committee and by the members of the various employers' associations. The union approval has been secured by the taking of a referendum vote among all of the employees who are members of the local unions as one group, and the result has been generally accepted with very few exceptions by the local union affected.

2. Prior to January 25, 1950, there was held a broad conference of union delegates from the various locals in the Northwest, at which it was decided by a majority vote to seek to amend the collective bargaining agreements between locals and district councils of the IWA-CIO and employers in the Pacific Northwest, to include provisions for a Health and Welfare Insurance Program paid for by the employers, and certain paid holidays. It was also decided not to seek an increase in wages. In accordance with this decision, substantially identical notices were given to the employers, including the defendant, by the local unions or their District Councils acting for them, of their intention so to revise the said agreements. At the same time, the employers were notified that the local unions had delegated to the Northwest Committee authority to negotiate for them on these requested modifications. Thereafter, beginning on February 20, 1950, to approximately April 1, 1950, one or more meetings were had with each of the various employer associations and the said independent employers. During this period, the principal negotiations were held with LIRC, WVLOA, and PIRC.

3. During these meetings, the employers and employer associations other than PIRC took the position that, as a matter of principle, the employers should not undertake to pay for and administer or help administer the union's health and welfare program and, for the most part, gave the Northwest Committee a flat "No" answer to the union demands. The employers submitted no counter-proposal and there was little discussion with respect to the details of the program requested or the insurance coverage to be provided. PIRC's position at this stage of the negotiations was expressed in a letter dated March 16, 1950, a copy of which is attached to the Stipulations.

(It might be observed at this juncture that, although the Stipulation does not point out any passage in PIRC's five-page single-spaced typewritten letter just referred to, an examination of the document by the Court discloses the following pertinent sentences:

"The costs involved in providing the health and welfare program demanded by your union are direct *wage costs*; just as much so as if they were wages going to the employees on their pay checks * * *.

* * * * * *

"It is our belief that our contracts should be extended, without change as to *wage cost* items." (Emphasis supplied.)

It is significant that, even at this early stage of the negotiations, the employers regarded the union-proposed Health and Welfare Plan as essentially a "wage increase" project, *and communicated that view to the employees.* This was before any controversy had arisen as to the *nature* of the proposed outlay demanded of the employers.

4. Continuing, the Stipulation sets forth that at the initial meetings held with LIRC and WVLOA, the coverage that the union was proposing was explained and the approximate cost of it given to the employers as $12.41 per month or 7½¢ to 8½¢ per hour.

5. On or about March 1, 1950, the Northwest Committee had notified the Federal Mediation and Conciliation Service, hereinafter referred to as FMCS, of the existence of the dispute and thereafter requested the services of that agency in working out a settlement. A commissioner of the agency, during the latter part of March, met with the Northwest Committee and with the employer associations and attempted to assist in settling the dispute.

6. On April 1, 1950, a second broad conference was held of delegates of the local unions. A report was there made of the meetings that had been held with the employers. The Northwest Committee recommended to the conference that the membership pledge its support to the program of health and welfare and paid holidays; that a strike vote be submitted to the membership, and a strike deadline fixed for May 15, 1950. This recommendation was adopted by the conference, and the majority of the membership voted in favor of a strike as proposed.

7. In April and May, meetings were held between the Northwest Committee and LIRC and the FMCS Commissioner. LIRC presented counter-proposals, which were rejected by the Northwest Committee because (1) the benefits were inadequate and (2) the employer was to have the right to select the insurance carrier and to enter into the contract of insurance and secure any premium dividends and rebates that might accrue.

8. The Northwest Committee proposed that (1) the insurance program be carried out by the creation of a jointly administered fund and (2) that one single policy of group insurance be purchased by the trustees of the fund for all employees in the industry and represented by IWA-CIO local unions. LIRC rejected this proposal.

9. On May 10, the Northwest Committee met with WVLOA, at which time the latter submitted its first counter-proposal. At that meeting there was the following discussion between Richard R. Morris, attorney and spokesman for WVLOA, and James E. Fadling, chairman and spokesman for the Northwest Committee. Fadling asked why WVLOA wished the 7½¢ expressed in terms of a wage increase, Morris replied that there was no particular reason for it. Fadling asked Morris whether it could, in his opinion, require check-off slips. Morris replied that it was not necessary.

10. On May 11, another meeting was held with WVLOA and there was further discussion of its counter-proposal. Fadling stated that the Northwest Committee was considering that having the 7½¢ per hour wage increase was a stumbling block and asked for a concrete reason why the association wishes to handle the matter in this way; that is, to grant a 7½¢ wage increase and then take it off. Morris replied that there was no particular reason, but the employers would accept this and they would not accept it the other way. An agreement was reached between the Northwest Committee and WVLOA on a recommended settlement.

11. On May 12, 1950, the Union had a further meeting with LIRC. The Northwest Committee presented to LIRC the settlement that had been reached with WVLOA, and asked that LIRC accept the same settlement. The spokes-

man for LIRC stated that "they" had doubts that the WVLOA settlement was legal, and that in the State of Washington "they" thought the law would require individual authorization. The spokesman for the Union Committee said that, in their opinion, it was legal and did not require any individual authorizations.

12. LIRC then indicated that they would accept the Union's earlier proposal of a jointly administered fund. The Northwest Committee replied that it had always been the practice to make the settlements uniform; that the WVLOA settlement had been accepted; and that they were insisting that LIRC accept the same settlement.

13. LIRC then requested the addition of language to the effect that, if the provisions with respect to the Health and Welfare Program were found to be in conflict with any Federal or State law, the parties would agree to amend them accordingly. The Northwest Committee accepted this addition, and the Committee and LIRC executed a joint recommendation.

At this point the qualified stipulation, referred to above, comes to an end, and the unqualified agreed statement of facts continues.

The first meeting between the Northwest Committee and PIRC, following the notices to revise and amend the existing contracts with the defendant, took place on February 21, 1950. The meeting was confined to an explanation of the Union demands by a spokesman of the Northwest Committee. Other such meetings were held subsequently, the details of which need not be rehearsed here.

After considerable negotiation, the Northwest Committee and PIRC executed a Joint Recommendation on May 15, 1950. This Joint Recommendation, frequently referred to in the briefs, reads in part as follows:

"Joint Recommendation.

"In full settlement of the Union's demand for paid holidays and a health and welfare program, the undersigned jointly recommend for acceptance to the local unions and employers, respectively represented by each, the following:

"1. All employees represented by the Union shall receive *a wage increase* of 7½¢ per hour effective May 1, 1950, and *wage* schedules shall be revised accordingly. The application of this *increase* to piece workers shall be left to local negotiations.

"2. There is added to each working agreement covering an operation where there is no existing employe benefit program in effect, the following clause:

" 'Each employe covered by this agreement authorizes and directs the Employer to deduct from his earnings each month the sum of not more than 7½¢ *for each hour worked by him* and to pay said sum for employe social benefits to such insurance carrier or carriers as the Union or its authorized representative may designate. Such carrier or carriers shall notify the Employer of the exact amount of such deduction and when deductions are to start, and payments shall be made on the statement of the Union and the insurance carrier in securing necessary information for coverage.'

"3. Effective May 1, 1950, there is added to each working agreement where an employe benefit program is now in effect, the following clause:

" 'Each employe covered by this agreement, and who is contributing to an existing employe benefit program, authorizes and directs the Employer to deduct from his earnings each month a sum equal to the amount heretofore contributed for such employe by the Employer to the existing employe benefit program and to pay the sums so deducted to such program.'

"Effective May 1, 1950, the Employer shall cease to contribute to

such program. At the Union's request existing programs may be cancelled in accordance with the terms of the program, but shall be continued until terminated or until modified by local agreement. An additional deduction in accordance with paragraph 2 above may be authorized provided the total deductions do not exceed 7½¢ per hour." (Emphasis supplied.)

Then follow provisions changing existing rules relative to holidays, not relevant here.

The recommendation closes with the following statement:

"5. Employe social benefit issues shall be closed until April 1, 1952."

This "Joint Recommendation" is signed by Fadling, representing the Northwest Committee, and by C. L. Irving, for the "Employers' Negotiating Committee", "By" PIRC.

After the execution of this "Joint Recommendation", direct negotiations began between the plaintiff and the defendant, leading up to an amendment to their own collective bargaining agreements. In these negotiations, the plaintiff was represented mainly by Tim Sullivan, President of Klamath Basin District Council No. 6, IWA-CIO, of which the plaintiff is a member. The defendant was represented by Robert A. Murphy, its general manager.

Murphy and Sullivan met on June 28, 1950. Murphy told Sullivan that the Company would require individual authorizations to be signed by employees before deductions would be made for the Health and Welfare Plan, because the Company had been advised by its attorneys that such authorizations were required by California law. Sullivan, on the other hand, stated that he had an opinion from the *Union's* legal department that such authorizations were not necessary.

Another meeting between the two men was held on July 12, 1950, at which time the parties were still in disagreement. The Company adhered to its position

that authorizations signed by individual employees should be provided for, and the Union declined to sign an agreement on that basis.

A further meeting between Murphy and Sullivan was held on or about July 18, 1950. At that meeting, Sullivan orally acquiesced to the Company's demand that a provision requiring wage deduction authorizations signed by individual employees should be inserted in the agreement. The complete text of that document, which is crucial in this case, follows:

"Memorandum of Agreement."

"For the purpose of carrying out the Recommended Settlement of May 15, 1950, to which the parties have heretofore agreed upon (sic) in principle, it is hereby agreed between Local Union No. 6–64, IWA-CIO, (Woods) and the McCloud River Lumber Company as follows:

"With regards (sic) to the 7½ cents per hour *wage* increase. The McCloud River Lumber Company shall withhold from the wages of such employee on the payroll as of July 1, 1950 such a sum as will amount to a total of 7½ cents per hour *for each hour worked* from May 1, 1950, and continue such deduction until otherwise directed by the Union. From the amounts so deducted, the McCloud River Lumber Company shall pay $3.50 per month per man to a hospital contractor to be designated by the Union, and such sums as are necessary to pay the cost of existing benefit programs until the same are cancelled.

"The balance of the 7½ cents per hour per employee shall be paid to John Hancock Mutual Life Insurance Company upon its written statements. All existing employee programs shall be cancelled by the Company effective as soon as possible under the terms of such program.

"The Union shall obtain a written authorization individually signed by each employee authorizing the foregoing deductions, and the Company will cooperate in obtaining such authorizations.

"The Union shall hold the Company harmless against all claims arising by reason of such deductions.

"Signed at McCloud, California, this 21 day of July, 1950.

The McCloud River Lumber Company
By s/s Robert A. Murphy"

"Local Union 6–64, I.W.A.–C.I.O.
"By s/s Laurence E. Lung, Pres.
 s/s Allan B. Hay, Secy. Treas
 & Bus. Agt.

On or about June 30, 1950 the IWA-CIO signed an application with the John Hancock Mutual Life Insurance Company, hereinafter referred to as the Hancock company, in the nature of a "binder" with insurance coverage effective July 1, 1950. The application for a policy was granted, and a policy was issued in September, 1950, effective July 1, 1950, and was amended on subsequent dates.

In September, 1950, the plaintiff entered into a contract with the Occidental Life Insurance Company of California to be the "hospital contractor" referred to in the Memorandum of Agreement, supra, and that Company was designated to the defendant as the hospital contractor. On or about October 1, 1951, the plaintiff dropped that Company as hospital contractor and substituted the Hancock company, so that for all aspects of the Health and Welfare Plan the Hancock company then became the plaintiff's sole insurance carrier.

The plaintiff has demanded that the defendant turn over to insurance companies designated by it the sum of 7½¢ per hour for all hours worked since May 1, 1950 by employees subject to its collective bargaining agreements with the defendant. (From May 1, 1950, to October 1, 1951, the demand was for $3.50 per month to be paid to the Occidental company, and the balance of the 7½¢ per hour to the Hancock company. Since October 1, 1951, the demand has been that the full 7½¢ per hour be turned over to the Hancock company.)

The plaintiff has demanded that the said sums be paid over by the defendant to the designated insurance companies for all employees subject to the collective bargaining agreements, irrespective of whether individual employees have or have not executed individual written authorizations permitting the deduction of the said sums from their wages. The plaintiff's demand has been and is that the defendant pay the 7½¢ per hour to the designated insurance companies even for employees who refuse to sign such individual authorizations.

The defendant has at all times taken the position that the July 21, 1950, Memorandum of Agreement provided for a 7½¢ per hour increase in basic wage rates, and for payments to designated insurance carriers to be made by deduction of 7½¢ per hour from the wages of employees upon the presentation of signed authorizations by individual employees. The defendant has refused to make the said deductions and turn the money over to insurance carriers for employees who refuse to sign such authorizations permitting the deductions to be made, and takes the position that its refusal is justified by the Memorandum of Agreement and by California law.

For the period from October, 1950, to March, 1952, inclusive, 16,115 of the defendant's employees subject to the collective bargaining agreements have executed such individual written authorizations, while 2,945 have declined to do so.

In all instances where such authorizations were executed, the defendant has made the deductions as authorized and has turned over the money to the proper insurance company. With respect to employees who have not executed authorizations, the defendant has declined to make the deductions.

As to the 7½¢ per hour referred to in the Memorandum of Agreement, the de-

fendant would have paid over the sum directly to the employees who declined to sign, had not the defendant been restrained from doing so by a temporary restraining order of this Court. As to such employees, the defendant is accumulating the 7½¢ per hour for disposition in accordance with the eventual order or judgment of this Court.

In 1951, employers and associations having collective bargaining relationships with the IWA–CIO or its affiliated local unions, agreed to a wage increase of 12½¢ per hour and the inclusion of certain additional paid holidays in collective bargaining agreements. These increases were subject to approval by the Wage Stabilization Board. Employers in the Douglas Fir Industry in the Pacific Northwest and the IWA–CIO filed a petition with the Wage Stabilization Board requesting approval of this wage increase. Employer associations that joined in this petition include LIRC and WVLOA, but not PIRC. This petition makes certain references to the Health and Welfare settlement of 1950.

Twenty-eight employers in the "Northwest Pine Lumber Industry" in the States of California, Oregon, and Washington, of which twenty-one were represented by PIRC, eleven in California and ten in Oregon, filed a separate petition with the WSB at the same time, requesting approval of the 1951 PIRC settlement, based upon the tandem relationship between the Northwest Pine Lumber Industry and the Douglas Fir Industry.

On August 14, 1951, the WSB approved the 12½¢ per hour wage increase.

The relevancy of the 1951 developments to the instant case will be discussed hereinafter.

2. The Pleadings and a Ruling on Evidence.

Most of the allegations in the extensive pleadings are covered by the Pre-Trial Stipulation, in so far as those allegations are pertinent to the decision in this case.

In the "Order and Ruling" of July 18, 1951, referred to in the Stipulation, supra, the Court said in part:

"Evidence of prior oral or other negotiations had between the parties to show that they intended by the written agreement of July 21, 1950, that 7½¢ per hour was not a wage increase is denied, unless plaintiff sets up in its claim grounds for reformation of the agreement. Such relevant prior negotiations will be admitted as an aid in determining whether the obtaining of individual written authorizations signed by each employee is a condition precedent to the withholding by defendant of 7½¢ per hour."

Such a claim for reformation of the agreement was presented by the plaintiff in an "Amendment to the Petition for Injunction and Statement of Claim", filed on November 3, 1951. The prayer of the amendment follows:

"Wherefore plaintiff prays that the Court decree that the agreement of July 21, 1950 be reformed to conform to the agreement intended by the parties, namely, that

"1. the sum of 7½¢ per hour for each hour worked by each of the defendant's employees from May 1, 1950 constitutes an employer-paid non-contributory health and welfare program; and that

"2. the agreement of the plaintiff to secure individual written authorizations from each of the defendant's employees, and the obligations of the defendant to pay 7½¢ per hour for each hour worked by each of its employees to designated insurance carriers be independent covenants; or

"3. the language in said agreement of July 21, 1950 obligating plaintiff to secure individual written authorizations from each of defendant's employees be eliminated from said agreement;

"and that the Court decree the specific performance of the re-

formed agreement between the parties, and for such other and further relief as this Court may deem fair and just in the premises."

3. The Plaintiff's Position.

The plaintiff summarizes its contentions as follows:

1. The collective bargaining agreement in issue was intended to and did provide for an employer-paid health and welfare program for the employees, without right on the part of any individual employee to receive the 7½¢ per hour as monetary wages or otherwise to control disposition of the money.

2. The union and the employer had full power through collective bargaining to establish the health and welfare program and to provide for the earnings' deductions and insurance payments.

3. The "deductions" and payments provided for in the agreement are not prohibited by any state laws covering the payment of wages: no prior written authorizations are at all necessary pursuant to law.

4. Reformation of the agreement should be ordered to conform to the agreement of the parties for an employer-paid health and welfare program.

The Court accepts the plaintiff's statement of the issues and will discuss them accordingly, although not in precisely the same order.

4. The Collective Bargaining Agreement Provided for a WAGE increase, Which In Turn Was Intended As The Method of Financing An EMPLOYEE-Paid Health and Welfare Plan.

Taking both the Joint Recommendation and the Memorandum of Agreement by their respective four corners, we find that both crucial documents point to a *wage increase,* out of which the individual employee, *at his option,* would contribute 7½¢ "for each hour worked by him". The pertinent language in each agreement has been italicized, supra.

The phrase "at his option" is used advisedly; for the Memorandum specifically requires that "The Union shall obtain a written authorization individually signed by each employee authorizing the foregoing deductions". The expression "individually signed" emphasizes the intention of the parties that this should not be a mere pro forma, blanket, rubber-stamp affair, but that *each individual employee should exercise his personal choice in the matter.*

Furthermore, it is stipulated that, as to those employees "who declined to sign", "defendant would have paid over said sum directly" to them, "had not defendant been restrained from so doing by the Temporary Restraining Order of this Court"; and that "With respect to (such) employees * * * defendant is accumulating the 7½¢ per hour for disposition in accordance with the eventual order or judgment of this Court." No greater guarantee of good faith could be demanded of the defendant.

Nor is this action on the part of the defendant a mere gesture. The stipulation shows that 2,945 employees have declined to execute the authorizations and will be entitled to collect their pay if judgment goes against the plaintiff. One of those 2,945 employees is the intervener herein, who asks that he "and his fellow-employees who have not participated in the health and welfare program be permitted to withdraw their accumulated wages."

At the close of its opening brief, the plaintiff seeks airily to dismiss the dissidents from the health and welfare program as being "a mere handful of employees". In an American court, 3,000 workmen who desire their admittedly earned pay are not to be cavalierly waved aside as "a mere handful"! A fist that could contain such "a mere handful" would indeed have to be Brobdingnagian!

The plaintiff argues that "The 1951 12½¢ per hour wage increase (supra) was approvable within the limits of the then existing wage freeze, *only if there had not been a prior wage increase* in the period beginning with the January 1950 base period, so as to break into the

limits then in existence * * *; Approval of the 12½¢ could only be upon the proof by the employers in the industry, including the defendant, that wage ceilings were not broken by the granting of the 12½¢ in question, inasmuch as it was established before the WSB that the Spring 1950 7½¢ per hour was *not* a wage increase, but was an employer-paid health and welfare program." The defendant rejoins that there is nothing in the record to show that if the 7½¢ in 1950 had been a wage increase, the WSB would not have approved the 12½¢ in 1951. In any event, consideration of this matter would carry us too far afield.

5. Individual Authorizations of This Type Are Required by State Law.

On the threshold of this phase of the discussion, it should be observed that the plaintiff contends:

> "Even if it be argued that the California statutes do require the individual authorization as a condition precedent to the payment into the health and welfare fund, the Federal law does not, and is therefore contrary, and the Union's authority under Federal law is paramount in respect to any State statute which is inconsistent with it."

In making this statement, learned counsel for the plaintiff has fallen into gross error. In a very recent decision, apparently overlooked by counsel, the Supreme Court has clearly and definitively traced the ambit of the Act and of the Board's power thereunder. In National Labor Relations Board v. American National Insurance Co., 343 U.S. 395, 401–402, 404, 408–409, 72 S.Ct. 824, 828, 829, 832, 96 L.Ed. 1027, decided on May 26, 1952, Mr. Chief Justice Vinson said:

> "*First.* The National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers. The Act does not compel any agreement whatsoever between employees and employers. *Nor does the Act regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement.* The theory of the Act is that the making of voluntary labor agreements is encouraged by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively.
>
> * * * * * *
>
> "* * * And it is equally clear that the Board may not, either directly or indirectly, compel concessions *or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.*
>
> * * * * * *
>
> "*Congress provided expressly that the Board should not pass upon the desirability of the substantive terms of labor agreements.*" (Emphasis supplied.)

The foregoing doctrine, though so recently expounded and amplified, is not new. In Terminal R. Ass'n of St. Louis v. Brotherhood of Railroad Trainmen, 1943, 318 U.S. 1, 6, 63 S.Ct. 420, 423, 87 L.Ed. 571, the Court used the following language:

> "The Railway Labor Act, like the *National Labor Relations Act,* does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. *The national interest expressed by those Acts is not primarily in the working conditions as such* * * *. The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce."[1] (Emphasis supplied.)

---

1. See also Allen-Bradley Local No. 1111, etc. **v.** Wisconsin Employment Relations Board, 1942, 315 U.S. 740, 749–751, 62 S. Ct. 820, 86 L.Ed. 1154; Davies Ware-

The law of California distinctly requires the type of individual authorizations insisted upon by the defendant in the instant case. Sections 222 and 224 of the State Labor Code provide:

"§ 222. It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either wilfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon."

"§ 224. The provisions of sections 221, 222, and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages when the employer is required or empowered so to do by State or Federal law *or when a deduction is expressly authorized in writing by the employee to cover insurance premiums, hospital or medical dues,* or other deductions not amounting to a rebate or deduction from the standard wage arrived at by collective bargaining or pursuant to wage agreement or statute." (Emphasis supplied.)

 Without laboring the point further, the Court holds that the California Labor Code requires that individual authorizations in writing be given by the employee in situations such as that presented here. The public policy of a State, as emphatically declared as it is in Sections 222 and 224 of the California Labor Code, cannot be ignored by a Federal Court in a matter clearly within the ambit of State power.

6. "The Union and the Employer Had Full Power Through Collective Bargaining to Establish the Health and Welfare Program"—And Did So—By Means of a Wage Increase.

In at least one portion of its brief the plaintiff seems to be in agreement with the defendant that the 7½¢ item was a "wage increase". The defendant describes it as "a wage increase * * * intended as the method of financing the health and welfare plan". The plaintiff, for its part, seems to join in this characterization when it says:

"If the union may, through collective bargaining with the employer, actually impair valuable seniority rights of individual employees, it would all the more clearly follow that, in a case where *the employer has provided a wage increase to pay for a Health and Welfare Program for the employees,* the right of the union to *impose* this plan upon the employees could not be questioned." (Emphasis supplied.)

To this Court, the difference between "a wage increase intended as the method of financing the health and welfare plan" and "a wage increase to pay for a Health and Welfare Program for the employees" seems like the difference between tweedledum and tweedledee!

Incidentally, it is somewhat strange that counsel for a union should admit that it is trying to "impose" *any* plan upon its membership!

The plaintiff does not agree throughout its briefs that the plan was a "wage increase"; for it says that "the 1950 negotiations * * * concluded in 'health and welfare' and not in a wage increase"; "Wages were not demanded"; "it was established before the WSB that the Spring 1950 7½¢ per hour was *not* a wage increase", etc.

Be that as it may, it already has been pointed out in this opinion that the 7½¢ item *was* a wage increase, which in turn was designed to be a method of financing a health and welfare program that was to be paid for by the *employees,* if they individually so chose.

 The Court agrees with the plaintiff's contention that "The Union and the Employer had full power through

house Co. v. Bowles, 1944, 321 U.S. 144, 152, 64 S.Ct. 474, 88 L.Ed. 635; Hill v. Florida, 1945, 325 U.S. 538, 539, 65 S. Ct. 1373, 89 L.Ed. 1782; Bethlehem

Steel Co. v. New York State Labor Relations Board, 1947, 330 U.S. 767, 773, 67 S.Ct. 1026, 91 L.Ed. 1234.

collective bargaining to establish the health and welfare program and to provide for the earnings' deductions and insurance payments". The Court is further of the view, however, that this program was to be in effect only as to *consenting* employees, and that it was to be financed by means of the *wage increase* that they had received.

7. Reformation of the Memorandum of Agreement Should Not Be Granted, Because (A) No Mistake Was Made and (B) If There HAD Been A Mistake, the Plaintiff Would Not Have Been the Party That Made It.

 It has already been shown that the law of California clearly requires the kind of individual authorizations that the defendant has demanded before it would turn the deductions of 7½¢ per hour over to the insurance carriers. Therefore the parties were not laboring under a mutual "mistake of law", such as is envisaged in Section 1578 of the California Civil Code, infra. Since the provision for individual authorizations was required by law, no mistake at all, mutual or otherwise, was made by inserting such provision into the agreement.

But if, for the sake of argument, we assume that there *was* a mistake—in other words, that the provision for individual authorizations is really *not* necessary under California law—it was a mistake under which the plaintiff at no time labored during the negotiations leading up to the signing of the agreement.

As we have seen, the Stipulation sets forth that Sullivan, the plaintiff's representative in the negotiations, "stated that he had an opinion from the Union's legal department that such authorizations were not necessary". At the trial, Sullivan testified that "our people had given us legal advice to that effect, that the laws did not require individual authorizations".

The real reasons why the Union signed the agreement with the provision for individual authorizations in it were thus outlined by Sullivan in his testimony regarding his negotiations with Murphy:

"Due to the accidental death and due to the fact that the Hancock Mutual Life Insurance Company would not pay the benefits until the contract was signed between the company and the local union guaranteeing them the premiums that we would agree to some wording in the contract relative to individual authorizations, with the understanding, I told him at that particular meeting, that I would recommend to the local union that if any individual did not sign the individual authorizations that (sic) we would bring the matter before the courts.

"I went into lengthy discussion with him relative to the position that the union was in, that we were faced with two (sic) alternatives: We could in all probability maybe strike the company and perhaps use economic action to try to get the company to see our viewpoint, or we could put the whole thing into litigation at that time, and if we did that all of the benefits that had been paid since that would be—that our people would be entitled to until such time as the courts decided it would be held in abeyance and nobody get any benefits."

These were what the plaintiff itself terms the "compelling forces" that caused Sullivan to give in.

Surely there was no "mistake of law" here on the plaintiff's part, even under its own theory of what the California law is. Just good old Yankee hoss-trading, the give-and-take that characterizes business bargaining!

Section 1578 of the Civil Code of California reads as follows:

"Mistake of law constitutes a mistake within the meaning of this article, only when it arises from:

"1. A misapprehension of the law by all parties, all supposing that they knew and understood it, and

all making substantially the same mistake as to the law; or,

"2. A misapprehension of the law by one party, of which the others are aware at the time of contracting, but which they do not rectify."

The record plainly shows that at no time was the plaintiff under any alleged "mistake" of the law, according to its theory of what the law is; namely, that individual authorizations are not necessary. Surely the plaintiff cannot rely upon the alleged "mistake" under which the *defendant alone* labored—if there *was* any mistake of law at all, which the Court holds was not the case.

Finally, the plaintiff emphasizes that *"The Agreement must be construed as an entirety in order to arrive at its true meaning"*. Yet it would have this Court reform the agreement (1) so as to make "independent covenants" of the "individual written authorization" provision and the "obligations of the defendant to pay 7½¢ per hour * * * to designated insurance carrier"; or (2) so as to eliminate the "individual written authorization" provision altogether. What does the plaintiff really want: Shall the agreement be (1) "construed as an entirety"; (2) split off into "independent covenants"; or (3) truncated by lopping off the inconvenient provision at one fell swoop?

8. Conclusion.

Accordingly, the Court holds that the Memorandum of Agreement provided for a *wage increase*, out of which the employee would contribute 7½ cents an hour for each hour worked by him; that such a plan amounts to an *employee-paid* health and welfare arrangement; that the plan applied only to those employees who individually executed written authorizations for the 7½ cent deductions; that as to those employees who have declined to sign such authorizations, the defendant is authorized to pay the 7½ cent wage increase in cash; that the temporary restraining order of October 23, 1950, which forbade such payment and which has been extended from time to time be and is hereby vacated; that the individually-executed written authorizations mentioned above are required by California law; and, finally, that the parties having made no mistake, mutual or unilateral, of law or of fact, there is no ground for ordering a reformation of the agreement of July 21, 1950.

A number of other defenses to the "petition for injunction and statement of claim" have been urged, but in the Court's view of the case, these additional defenses need not be considered.

The defendant has filed a counterclaim, raising the same issues as those brought up by the plaintiff's first cause of action and the defendant's answer thereto. A counterclaim for a declaratory judgment is permissible. Connecticut Indemnity Co. v. Lee, 1 Cir., 1948, 168 F.2d 420, 423; 1 Barron and Holtzoff, "Federal Practice and Procedure", § 400.

Under all the circumstances of this case, the Court holds that the defendant is entitled to a declaratory judgment in conformity with this opinion.

The defendant shall submit proposed Findings of Fact, Conclusions of Law, and Judgment.