Monongahela Connecting Railroad Company, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued April 12, 1965. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*McCook Miller,* with him *Joseph A. Katarincic,* and *Kirkpatrick, Pomeroy, Lockhart & Johnson,* for appellant.

*Louis J. Carter,* Assistant Counsel, with him *Joseph C. Bruno,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Thomas Park Shearer,* with him *Brandon, Shearer & Flaherty,* for intervenors.

OPINION BY WATKINS, J., June 17, 1965:

In this appeal from an order of the Pennsylvania Public Utility Commission the appellant, The Monongahela Connecting Railroad Company, complains that the order was not supported by substantial evidence; and that the order would impair the ability of the appellant to serve its principal shipper, the Pittsburgh Works of Jones & Laughlin Steel Corporation.

This case began with a complaint to the Public Utility Commission filed by the Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania and George W. Legge, a trainman employee of the appellant, seeking relief from an alleged unsafe condition resulting from the operation of railroad movements by the appellant over the hot metal bridge in the City of Pittsburgh. The commission granted relief in part and this appeal followed. The brotherhoods were permitted to intervene.

The complaint was filed under the provisions of Art. IV, §§401, 413 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, 66 PS §1101 et seq. As we said in *Erie-Lackawanna Railroad Company v. Pennsylvania Public Utility Commission,* 205 Pa. Superior

Ct. 291, 208 A. 2d 908 (1965), decided April 13, 1965, "At the outset it should be noted that after years of railroad regulation by the commission they have developed a staff of technicians for their counsel and advice on matters that have to do with railroad operation in the safety field, so that they are able to take notice of what may be obvious hazards to the personnel and the public." Their orders in regard to safety problems must therefore be entitled to great weight by the reviewing court. The commission is given the power and jurisdiction to grant relief to railroad employees whose personal safety is jeopardized by conditions under which they work. *Pa. Railroad Co. v. Pa. P.U.C.*, 202 Pa. Superior Ct. 114, 195 A. 2d 162 (1963); *Reading Co. v. Pa. P.U.C.*, 188 Pa. Superior Ct. 146, 146 A. 2d 746 (1958). The only question before us is whether the order was arbitrary and unreasonable; that the commission abused its administrative discretion; and that the order was not supported by competent and probative evidence.

The hot metal bridge is located near 29th Street, Pittsburgh and crosses certain mill and rail facilities on both the north and south banks of the Monongahela River as well as the river itself. It is a single track bridge, 1200 feet in length and has a grade in excess of two (2%) per cent. For more than twenty-five years the railroad has been operating two movements of freight over the bridge. The two movements are known as the hot metal and Talbot movements. The bridge connects the blast furnaces of Jones & Laughlin on the north side of the river with the open hearth furnaces on the south side of the river.

The hot metal movement is made up on the north side where individual ladle cars are loaded with hot metal at the blast furnaces. They are assembled in a train consisting of a diesel locomotive, four ladle cars and three spacer cars which serve as separators and

distributors of the weight of the ladle cars. The entire movement weighs approximately 950 tons. The train is pushed up grade and southwardly by the diesel locomotive over the bridge to the open hearth furnaces on the south side. There the ladle cars are dumped into a mixer from where they go into the open hearth furnaces. The empties are then moved back across the river.

Each ladle car loaded weighs approximately 180 tons and each is equipped with a hand brake. There is no air brake equipment on the ladle or spacer cars. The diesel locomotive has air brake equipment. The number of hot metal movements across the bridge varies depending upon the demand of the steel plant customer. It reached as many as 22 trips per day in January 1962 and presently consists of three or four daily trips. In the so-called Talbot movement across the bridge the diesel locomotive pushes four to eighteen hopper cars containing raw material from the north side to the open hearth furnaces on the south side. These cars weigh 180,000 pounds loaded. They are equipped with train line air brakes.

As in *Erie-Lackawanna Railroad Company v. Pennsylvania Public Utility Commission,* supra, and in the instant case, the record does not disclose the kind of substantial evidence a reviewing court would like to see in it. We realize, only too well, that in hazardous occupations such as mining and railroading, especially in hot metal movements, all the safety regulations in the world won't remove the hazard entirely but safety regulations that may reduce an industrial hazard should always be installed if such installation does not destroy the competitive life of the business.

Substantial evidence has been defined as meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Pittsburgh & Lake Erie R.R. Co. v. Pa. P.U.C.,* 170 Pa. Superior Ct.

411, 85 A. 2d 646 (1952). This record contains sufficient evidence as so defined. The appellant's chief contention is that its service would be so impaired by the delays occasioned by putting train line air brakes in operation that they would be unable to meet the requirements of the peak loads of the steel company.

It should also be pointed out that the financial cost of the changes involved is not important to the appellant but only the impairment of service to the customer. We have said many times that the economics of the situation where railroads are concerned in this modern era is to be taken into consideration but we have also said "that unlike petitions for the reduction of services to save costs, where the Commission is under a duty to take into consideration the modern economic plight of railroads and permit the saving, . . . no saving could be permitted at any risk to the safety of the public." *Delaware & Hudson R.R. Corp. v. Pa. P.U.C.,* 198 Pa. Superior Ct. 464, 182 A. 2d 254 (1962). The appellant makes much of the fact of the prior good safety record of this operation and that there is no evidence of prior accidents resulting in wrecks or personal injury during the many years of operation. However, if we were to decide these problems only on that basis in the face of evidence of a probably dangerous situation that could be corrected with air brakes and the next month personal injury or death result from an accident caused by inefficient braking on the hot bridge, there would indeed be a red-faced court. As we said in *Pa. Railroad Co. v. Pa. P.U.C.,* supra, at page 117: "Although there is no substantial evidence of the occurrence of any serious accidents at this crossing, we do not believe that fact limits the power of the Commission to correct a condition which it believes may lead to the injury or death of persons subjected to such condition."

The following findings can be gleaned from the opinion of the Commission.

"From the record before us it is difficult to visualize the topography and track layout which affects working conditions. It appears that the hot metal bridge which spans the Monongahela River is about 1000 feet in length and that its 1.58 per cent grade is followed for the next 400 feet by a 2.06 per cent grade and for the following 400 feet by a 2.19 per cent grade. The grade ascending from north to south then drops back to 1.48 per cent. In the vicinity where the Talbot cars are discharged over the bins it would be dangerous for trainmen coupling or uncoupling cars but there is an indication such work could be performed between the open hearth location and the bridge. The bridge itself is a single track structure and escape to the bridge walkway from a runaway train would be exceedingly hazardous.

"It must also be noted that moves similar to the Talbot movement, when made on the adjacent level bridge across the river, are made with fully connected train line air brakes in accordance with ICC regulations.

"The record indicates that the current practice of pushing from 10 to 22 hot metal movements daily up-grade across the bridge and continuing up and to the open hearth area has been followed for about 25 years. The size of the ladles was increased in about 1948 or 1949 and the capacity of the Jones & Laughlin plant and hence, demand on the operation has been increased over the years. The current weight of the hot metal movement is about 950 tons including locomotive, four loaded ladles and three spacer cars. The recommended maximum load developed by test for an up-grade movement using 115 ton diesel locomotives now in service is 1000 tons. No increase in the total weight of the

movement is contemplated although a change using a heavier, larger ladle is under consideration.

"Such limitation envisages a move upgrade where a stop could be made and the train started provided the engine did not drift back more than a half car length to obtain slack before moving forward. A greater drift would impose operating hardships and it might be necessary to consider the move as a downgrade operation where the maximum allowable train tonnage recommended is 700 tons.

"The Talbot move made from one to four times daily is of variable size and can be as much as eighteen 90-ton cars plus locomotive or a total of 1700 tons. Cars used in the Talbot movement are equipped with air brakes. The ladles are equipped with single hand brakes each and have been so equipped over a long period. The hand brakes are placed next to the spacer cars and the trainmen's testimony indicates the hazards encountered by them in making an emergency application of the hand brakes on the ladle cars.

"The record does not show any indication of past difficulties in control of an upgrade loaded hot metal movement. It does disclose that there may have been some problems with the return downgrade light movement, but it does not show that this trouble resulted from defective hand brake equipment. There is also reasonable indication that difficulty would be created by a Talbot move if motive power provided were insufficient."

And the Commission concluded from these facts that:

"From the absence of evidence of any accidents occurring in this operation it appears that normal operations do not present an undue hazard. However, it is clear that in the operations described, certain features by combination of human error and coincidence create a dangerous situation.

. "Upon full consideration of the matters and things involved, we find and determine that dangerous and unsafe conditions occur in the operation by The Monongahela Connecting Railroad Company of railroad movements over a bridge across the Monongahela River, in the City of Pittsburgh, in the vicinity of 29th Street."

And the Commission entered the following order: "That the Monongahela Connecting Railroad Company forthwith install or cause to be installed air brakes of approved design on all ladle cars, spacer or reach cars, and other cars to be operated on its hot metal bridge at 29th Street." "That the Monongahela Connecting Railroad Company forthwith amend its operating rules to provide that no movement of a locomotive and cars shall be made in either direction across its hot metal bridge at 29th Street and the succeeding grades in excess of 2 per cent unless such cars are equipped with fully operative train line air brakes all properly connected by through train line with the locomotive; provided, however, that until such time as the cars are equipped with proper air brakes, the carrier may make moves on the involved trackage with total train tonnage not to exceed 700 tons per locomotive and provided further that the speed of all such train movements made without train line air brake shall not exceed a speed of 8 miles per hour."

In support of the complainant's allegation that the movements across the bridge present an unreasonable risk without train line air brakes, a witness testified that the Talbot shifts had such equipment that could be connected by the crews and be in use in ten minutes. He testified that as a conductor no operating problem presented itself and that such equipment could be coupled up, the air pressure built up, and be in operation in ten minutes. He testified that in his opinion air brakes were necessary on hot metal and Talbot movements to provide a reasonable amount of safety. He

described the use of the hand brake and the increased protection of air brakes and pointed out that the only manner of escape from a train run wild or derailed would be to jump in the river.

Another witness testified to the need of air brakes and gave his experience as a member of a crew during certain tests when it was found that independent brakes on the engine could not hold the train under all circumstances and that in ordinary operations trains had gotten away and run through the block when they tried to take slack and start up the bridge.

A witness testified that in his opinion the use of train line air brakes would not require any additional employees and that the work could be done by the car inspectors; that it would only require ten to fifteen minutes to prepare the train line air brakes and probably less.

The general superintendent of the appellant testified that he was opposed to the use of air brakes because the company would not be able to meet the peak load requirements of the steel company. He testified that in January 1962 he scheduled 22 hot metal trips per day and that a loss of ten minutes would result in one less trip a day. His testimony disclosed however that there were other delays resulting from other causes that might be eliminated and so allow the additional time for air brakes without cutting down the number of loads. It was also pointed out that the contemplated use of larger ladle cars would help solve this problem. He admitted that under the present load demand the connection of train line air brakes presented no problem.

As there is no question of jurisdiction the court is under no duty to exercise independent judgment or to weigh conflicting evidence, *Bridgewater Boro. v. Pa. P.U.C.,* 181 Pa. Superior Ct. 84, 101, 124 A. 2d 165 (1956), but is limited to the determination of whether

there is substantial evidence to support the findings and order of the Commission. *Gradison A. Bus Co., Inc. v. Pa. P.U.C.,* 199 Pa. Superior Ct. 303, 184 A. 2d 334 (1962). We find that there was not a manifest abuse of administrative discretion by the Commission and that the findings and order are supported by substantial evidence.

Order affirmed.