**The MONONGAHELA CONNECTING RAILROAD COMPANY, Plaintiff,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION and George I. Bloom, P. Stephen Stahlnecker, William F. O'Hara, John L. Dorris and Maurice H. Claster, Commissioners, and Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania, Defendants.**

**Civ. A. No. 65-1102.**

United States District Court
W. D. Pennsylvania.
April 18, 1966.

Joseph A. Katarincic, Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., for the Monongahela Connecting Railroad Co.

Thomas P. Shearer, Brandon, Shearer & Flaherty, Pittsburgh, Pa., for Co-Operative Legislative Comm. of the R. R. Brotherhoods in Pa.

Edward Munce, Harrisburg, Pa., for Public Utility Comm. and the Commissioners listed (all defts., except Co-Operative Legislative, etc.).

DUMBAULD, District Judge:

Plaintiff, a short-line industrial railroad, sues to restrain enforcement of an order of the Pennsylvania Public Utility Commission (hereinafter referred to as P.U.C.) requiring the use of airbrakes on certain train movements via the 29th Street bridge across the Monongahela River in Pittsburgh. A three-judge court was requested, but Chief Judge Harry E. Kalodner of the Third Circuit concluded that such a tribunal was not appropriate. The order of October 25, 1965, to that effect was corroborated by the order of December 2, 1965, following confirmation of his judgment by the decision of the Supreme Court in Swift and Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15

L.Ed.2d 194, decided on November 22, 1965. The facts underlying the instant case appear in the opinion of the Pennsylvania Superior Court, upholding the P.U.C. order, in Monongahela Connecting Railroad Company v. Pennsylvania P.U.C., 206 Super. 17, 211 A.2d 113, decided June 17, 1965.

Plaintiff's contention now is that the police power of the State is superseded by federal occupation or pre-emption of the entire field of airbrake regulation by Congressional legislation. Through oversight and inadvertence, or as a matter of tactical advantage, plaintiff failed to raise this issue either before the P.U.C. or in the Superior Court. However, on October 4, 1965, plaintiff filed with the P.U.C. a petition seeking to raise that issue, and on October 11, 1965, filed another similar petition. Apparently these petitions were denied by the P.U.C. and no supplemental relief was sought by plaintiff in the State courts, although the record is not clear on these points.

■ It is elementary that in the absence of federal occupation of the field the police power of a State extends to matters involving protection of the public safety. Chicago, R. I. & P. Ry. Co. v. State of Arkansas, 219 U.S. 453, 465, 31 S.Ct. 275, 55 L.Ed. 290 (1911); Maurer v. Hamilton, 309 U.S. 598, 603, 60 S.Ct. 726, 84 L.Ed. 969 (1940); Terminal R. R. Ass'n of St. Louis v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 7, 63 S.Ct. 420, 87 L.Ed. 571 (1943); Dumbauld, The Constitution of the United States 126 (1964). The question therefore is, what is the scope and extent of federal legislation concerning airbrakes?

One might have supposed that, like other features of the federal Safety Appliance Acts (relating to couplers and the like), the airbrake requirements would be applicable to all vehicles used on any railroad which is a highway of interstate commerce, whether the particular vehicles were used in moving interstate traffic or intrastate traffic. Southern Ry. Co. v. United States, 222 U.S. 20, 26, 32 S.Ct. 2, 56 L.Ed. 72 (1911).

■ However, careful inspection of the pertinent airbrake legislation shows that such requirements apply only to (1) "trains" which are (2) moving in interstate commerce. First enacted on March 2, 1893, 27 Stat. 531, 45 U.S.C. § 1 provides:

"It shall be unlawful for any common carrier *engaged in interstate commerce* by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to *run any train in such traffic* that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." (Italics supplied)

United States v. Seaboard Air Line Railroad Co., 361 U.S. 78, 80, 82, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959), clearly shows that the airbrake requirements apply only to "trains" and not to "true switching operations".

What is the essential difference between these two types of railroad operations? We believe that switching operations involve movements of a small number of cars, over a short distance, where frequent stops and starts must be made to pick up or "spot" cars at many different locations, in connection with assembling or breaking up trains which are about to move or have moved in line-haul travel.

Accordingly, we believe that what is called the "Talbot movement" in this case is a true switching operating. It involves delivery to open hearth furnaces of the Jones & Laughlin Steel Company on the south side of the Monongahela River of shipments of raw material in "foreign cars" (belonging to other railroads) which have been received by plaintiff from numerous points of origin in interchange with line-haul carriers in interstate commerce.

On the other hand, we believe that the so-called "hot metal movement" is not a true switching operation and that it is a purely intrastate movement. It is basically merely a part of the manufacturing operations of the steel company, although handled by plaintiff as a separately incorporated carrier. This movement consists of a Diesel locomotive pushing four ladle cars which are filled with hot molten metal at blast furnaces of the steel company on the north side of the river and are then moved to the open hearth furnaces located on the south side of the river. The hot metal cars are separated by spacer cars which simply serve for operating convenience and safety. It is true that some switching is done on the south side, and the spacer cars are put together on the return movement when they are no longer needed as separators. But this also is simply a matter of operating convenience. The only "revenue freight" (if it may be so described) is the hot metal. Such freight originates in one part of the Jones & Laughlin plant, in Pennsylvania, and is delivered to another part of the same plant in the same State. There is no interstate movement. The hot metal cars have not been received from other railroads in interchange, and have not had any prior or subsequent line-haul movement. The entire transportation service consists of a single, continuous movement from the blast furnaces to the open hearth furnaces. Such movement is not incident to the assembling or breaking up of a train about to move, or which has moved, in line-haul travel or in interstate commerce.

■ We therefore conclude that the hot metal movement is not a true switching operation and is therefore not subject to the exemption accorded to such operations. But it is likewise not within the terms of the federally-imposed requirements for airbrakes under 45 U.S.C. § 1, since the metal cars do not move in interstate traffic. It therefore remains subject to State regulations. The Talbot movement, however, we believe is exempt from State regulation.

■ Speculations as to the significance of the silence of Congress are always dubious. See Biklé, "The Silence of Congress", 41 Harvard Law Review 200 (1927). The general rule in a case relating to federal occupation of the field is that State power is excluded, not only where there would be actual conflict between the federal and State regulations, but also where the scope and structure of the federal regulations is such that an exercise of State power would interfere with, hinder, obstruct, or frustrate the scheme of federal regulations. Southern Ry. Co. v. Railroad Comm. of Indiana, 236 U.S. 439, 446–447, 35 S.Ct. 304, 59 L.Ed. 661 (1915); Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 157, 62 S.Ct. 491, 86 L.Ed. 754 (1942); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); People of State of California v. Zook, 336 U.S. 725, 729, 69 S.Ct. 841, 93 L.Ed. 1005 (1949); Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 443, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); Campbell v. Hussey, 368 U.S. 297, 300–302, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Local 20, Teamsters, etc., Union v. Morton, 377 U.S. 252, 258, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); O'Brien v. Western Union Tel. Co., 113 F.2d 539, 541 (C.A. 1, 1940). The issue of pre-emption must always be determined on a case-by-case basis. Pennsylvania R. R. Co. v. Public Service Comm'n, 250 U.S. 566, 569, 40 S.Ct. 36, 64 L.Ed. 1142 (1919); People of State of California v. Zook, 336 U.S. 725, 731, 69 S.Ct. 841 (1949).

■■ Accordingly, we conclude that federal regulation of airbrakes is exclusive so far as it extends. In other words, with respect to interstate movement, we believe that Congress intended to occupy the field, and established requirements applicable to "train" movements. The distinction between train movements and switching movement implies a recognition that it would be inconvenient, im-

practical, or burdensome to require the use of brakes on movements that are true switching operations; that is to say movements of a small number of cars, for short distances, frequently interrupted by the need to pick up or drop off individual cars at particular locations, in connection with the assembling or breaking up of line-haul trains. Therefore, the lack of a Congressionally-imposed requirement for the use of airbrakes in these movements is indicative of a Congressional intent that no such regulation be required. This precludes the exercise of State authority with respect to a genuine switching movement involving interstate commerce.

■ Most of what has been said up to this point, however, is simply dictum. It is also largely *brutum fulmen.* In the interest of procedural regularity, we are impelled to decide that this case is not properly before this Court for decision. The questions regarding occupation of the field and pre-emption could and should have been raised before the P.U.C. and the Superior Court. The doctrine of pre-emption is not a novel concept which has recently and suddenly sprung, Minerva-like, from the cerebral organs of the Supreme Court of the United States. It is not an issue of which the P.U.C. first took cognizance in the current proceedings relating to safety devices to control locomotives operated by a single crew member, Investigation Docket No. 75, wherein it made the order of July 19, 1965, 42 Pa.P.U.C. 247, which apparently suggested the pre-emption issue to plaintiff's counsel in the case at bar. The P.U.C. is not subject to the administrative limitations by which the New Jersey Public Utility Commissioners felt themselves bound in Pennsylvania Greyhound Lines v. Board of Public Utility Commissioners, 107 F.Supp. 521, 529 (D.N.J. 1952).

■ Conscientious application of federal law by State tribunals is to be expected. United States District Courts do not sit as appellate tribunals to review (or to by-pass) the determinations of State courts on federal questions. The proper procedure for ensuring uniform interpretation of federal law is through the appellate route leading to the Supreme Court of the United States. Baker Driveaway Co., Inc. v. Hamilton, 29 F. Supp. 693, 694 (M.D.Pa.1939); Cunningham v. Aberman, 252 F.Supp. 602, Western District of Pennsylvania, opinion by Judge Sorg, dated March 25, 1965; Dairy Distributors, Inc. v. Western Conference of Teamsters, 294 F.2d 348, 352 (C.A. 10, 1961); Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 349, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); Atlantic Coast Line R. R. Co. v. City of St. Petersburg, 242 F.2d 613, 615–616 (C.A. 5, 1957); West Virginia Motor Truck Ass'n. v. Public Service Comm'n of West Virginia, 123 F.Supp. 206, 216 (S.D.W.Va.1954); Angel v. Bullington, 330 U.S. 183, 189, 67 S.Ct. 657, 91 L.Ed. 832 (1947); Chicot Co. Drainage District v. Baxter State Bank, 308 U.S. 371, 378, 60 S.Ct. 317, 84 L.Ed. 329, 378 (1940); East Crossroads Center v. Mellon-Stuart Co., 245 F.Supp. 191, 194 (W.D.Pa.1965); Grubb v. Public Utilities Comm'n, 281 U.S. 470, 475, 50 S.Ct. 374, 74 L.Ed. 972 (1930).

If it be thought that as a result of our decision, collusive or ill-advised action by litigants might have the effect of frustrating or frittering away a fundamental federal policy [cf. Kalb v. Feuerstein, 308 U.S. 433, 438–439, 60 S.Ct. 343, 84 L.Ed. 370 (1940); United States v. United States F. & G. Co., 309 U.S. 506, 514, 60 S.Ct. 653, 84 L.Ed. 894 (1940); Louisville & N. R. R. Co. v. Mottley, 219 U.S. 467, 476, 31 S.Ct. 265, 55 L.Ed. 297 (1911); Pennsylvania R. R. Co. v. Sharfsin, 240 F.Supp. 233, 236 (M.D. Pa.1965); Lewis v. Harcliff Coal Co., 237 F.Supp. 6, 8 (W.D.Pa.1965)], the answer is that the flexibility of administrative procedures and the fact that the present situation involves the continuous regulation of a matter (similar to the level of railroad rates or the most suitable custody of a minor child) will suffice to insure that subsequent proceedings

will be available in appropriate tribunals should there be need thereof.

In fact, it would seem that in any case "in which the powers and authority of the [Public Utilities] Commission to act are called in question" an injunction can be sought under 66 P.S. § 1441 in the Common Pleas Court of Dauphin County even after an appeal from the P.U.C. to the Superior Court has been taken under 66 P.S. § 1431. York Rys. Co. v. Driscoll, 331 Pa. 193, 196, 200 A. 864 (1938). See also Blythe Twp. Mun. Authority v. Pennsylvania Public Utilities Comm'n, 191 Super. 542, 546, 159 A.2d 256 (1960).

Perhaps logically the first question which should have been considered is the matter of venue. In view of our other conclusions, however, it is unnecessary to discuss this question. Two members of the Public Utilities Commission are residents of this District and were served here. But the instant cause of action is based entirely upon their official acts, doings, and proceedings as members of the P.U.C. The individual defendants are simply fifth wheels insofar as being sued individually is concerned; this practice is simply a measure of caution dictated by the conservative habits of the legal profession. The suit really should have been brought at the official residence, rather than the personal domicile, of the members of the P.U.C. United Office and Professional Workers of America v. Smiley, 75 F.Supp. 695, 699–700 (E.D.Pa. 1946). Cf. Northern Indiana Public Service Co. v. Public Service Commission of Indiana, 1 F.Supp. 296, 297 (N.D.Ind. 1932). In that case (affirmed by the Supreme Court *per curiam*) venue in the Northern District of Indiana was sustained upon the ground that one of the members of the Commission lived in that district, although the office of the Commission was at Indianapolis, in the Southern District of Indiana.

However, there is no need in the case at bar to attempt to reconcile the variances discoverable in the decisions regarding the niceties of venue. We prefer to rest our decision upon a clearer and stronger ground, to wit, the impropriety of intrusion by this Court upon the province of the administrative and judicial "magistracies" of Pennsylvania. We entertain no doubt that "these authorities will in their respective functions do what is right and just" in a manner warranting "the respect and confidence due to those magistracies, and sincerely believed by me to be justly due to them."[1]

Accordingly, plaintiff's complaint in this Court is dismissed.

### JUDGMENT

AND NOW, this 18th day of April, 1966, upon consideration of cross motions for judgment, after argument, for the reasons set forth in the foregoing opinion,

It is ordered, adjudged, and finally decreed that plaintiff's motion for judgment be and the same hereby is denied, and that defendants' motion for judgment be and the same hereby is granted, and that plaintiff's amended complaint and action be and the same hereby is dismissed.

1. Thomas Jefferson to Stephen Kingston, September 25, 1816, Library of Congress, Jefferson Papers, Vol. 208, item 37073, quoted in Dumbauld, "Thomas Jefferson and Pennsylvania Courts", 37 Pa.Bar Assn.Q. (March, 1966) 236, 241.