The **MONONGAHELA CONNECTING RAILROAD COMPANY**, Appellant,

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION** and George I. Bloom, P. Stephen Stahlnecker, William F. O'Hara, John L. Dorris, and Maurice H. Claster, Commissioners

and

**Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania**, Appellees.

No. 15962.

United States Court of Appeals Third Circuit.

Argued Nov. 14, 1967.

Decided Feb. 14, 1967.

Joseph A. Katarincic, Pittsburgh, Pa., Thomas W. Pomeroy, Jr., Thomas C. Mayer, Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., James H. Booser, McNees, Wallace & Nurick, Harrisburg, Pa., on the brief, for appellant.

William A. Goichman, Philadelphia, Pa., Edward Munce, Asst. Counsel, Joseph C. Bruno, Chief Counsel, Harrisburg, Pa., on the brief, for appellee, Pennsylvania Public Utility Commission.

Thomas Park Shearer, Pittsburgh, Pa. (Brandon, Shearer & Flaherty, Pittsburgh, Pa., on the brief), for Co-Operative Legislative Committee, Railroad Brotherhoods in State of Pennsylvania.

I. K. Hay, Deputy General Counsel, Interstate Commerce Commission, Washington, D. C. (Robert W. Ginnane, General Counsel, Marcus L. Meyer, Richard C. Davis, Attys., Interstate Commerce Commission, Washington, D. C., on the brief), amicus curiae, Interstate Commerce Commission.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

## OPINION OF THE COURT

McLAUGHLIN, Circuit Judge.

This controversy arose out of a complaint lodged with the Pennsylvania Public Utility Commission (P.U.C.) by the Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania (Brotherhood) and George W. Legge, a trainman employee of the appellant, The Monongahela Connecting Railroad Company. The complaint charged an unsafe condition caused by appellant's operations on the 29th Street hot metal bridge across the Monongahela River in Pittsburgh. The P.U.C. handed down an order which stated inter alia, that appellant was required to install "air brakes of approved design on all ladle cars, spacer or reach cars, and other cars to be operated on its hot metal bridge at 29th Street", and that appellant amend its operating rules to conform with the order, providing that it could continue its operations on a limited scale until such requirements were met. The Commission's order was affirmed by the Pennsylvania Superior Court, Monongahela Connecting R. R. Co. v. Pennsylvania Public Utility Commission, 206 Pa. Super. 17, 211 A.2d 113 (1965). Appellant then filed a complaint in the United States District Court for the Western District of Pennsylvania asking that the order of the P.U.C. be declared null and void as being unconstitutional and repugnant to federal law and that the defendants (the P.U.C. and Brotherhood) be enjoined permanently from taking any action in an attempt to enforce the order. The complaint was dismissed with an opinion by Judge Dumbauld, 253 F.Supp. 50 (W.D.Pa.1966), and plaintiff appealed.

Appellant railroad conducts two freight movements across the 29th Street hot metal bridge in Pittsburgh. The bridge is a single track structure, 1,200 feet in length, with a grade in excess of two per cent. It connects the blast furnaces of the Jones & Laughlin Steel Company on the north side of the river with the open hearth furnaces on the south side of the river. It crosses mill and rail facilities on both the north and south banks of the Monongahela River as well as the river itself.

The two said freight movements are known as the hot metal movement and the Talbot movement. The hot metal movement transports hot molten metal in ladle cars from the blast furnaces on the north side of the river to the open hearth furnaces on the south side. The hot metal train is made up of a diesel locomotive, four ladle cars, each weighing approximately 180 tons when loaded, and three spacer cars which separate and distribute the weight of the ladle cars. The entire movement weighs approximately 950 tons and moves up grade and southwardly from the blast to the open hearth furnaces. The Talbot movement picks up hopper cars from trunk line railroads (Pennsylvania Railroad, Pittsburgh & Lake Erie and Baltimore & Ohio) at interchange points from which they are assembled, classified and transported by appellant over various tracks and across the 29th Street bridge. The entire operation consists of a diesel

locomotive which pushes four to eighteen hopper cars, each weighing approximately 180,000 pounds when loaded, from the north side of the river to the open hearth furnaces on the south side. Both the Talbot and hot metal movements traverse tracks that are utilized by other movements which distribute commodities throughout the world.

Appellant urged before the District Court that the P.U.C. had no authority to issue an order requiring the railroad to install air brakes on its movements since the entire field has been preempted by the Federal Government with the passage of the Safety Appliance Act, 27 Stat. 531, 45 U.S.C. Sections 1–8 (1893), as amended. Judge Dumbauld in his opinion concluded that the Safety Appliance Act did not apply to the Talbot movement since it was a switching operation which is exempt from the air brake requirements of the Act, United States v. Seaboard Air Line R. Co., 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959). The Court also found that the hot metal movement was not a true switching movement and therefore was not subject to the exemption afforded such operation, but it was further established that this same hot metal movement was " * * * not within the terms of the federally-imposed requirements for air-brakes under 45 U.S.C. 1, since the metal cars do not move in interstate traffic." Monongahela Connecting R. Co. v. Pennsylvania Pub. U. Commission, 253 F. Supp. 50, 53 (W.D.Pa.1966). However, the District Judge regarded that portion of his opinion which dealt with federal occupation and preemption as "simply dictum". The action was dismissed on the decision that the case was not properly before the court since the questions concerning federal occupation and preemption were not raised before the P.U.C. or the Pennsylvania Superior Court. An additional ground for dismissal was because appellant commenced its suit in the District Court without having exhausted its appeals at the state level.

■ As we see it, under all the circumstances, appellant was entitled to bring this federal complaint. There is some evidence that prior to so doing it had presented the question of federal occupation and preemption to the P.U.C.[1] Irrespective of that, it was and is entitled to have the issues set forth in its complaint determined by the Federal Courts irrespective of whether they had ever been passed upon by the Commonwealth Courts. Appellant's objective in this appeal has no affinity to the type of proceedings where the moving party must raise every issue in the state tribunals prior to coming into the Federal Court. The latter's primary initial concern with respect to this appeal is whether it possesses jurisdiction of the cause of action alleged. There was some passing mention in the District Court of possible doubt about the venue of this action. Though the point is not raised on appeal, we have examined it and find it without merit.

■ Considering the second ground for dismissal i. e. the failure to exhaust the state remedy, the Trial Court stated that "(t)he proper procedure for ensuring uniform interpretation of federal law is through the appellate route leading to the Supreme Court of the United States." 253 F.Supp. 50, 53. That method is more commonly known as the abstention doctrine and has been applied inter alia in situations dealing with facts somewhat akin to our problem, Alabama Public Service Commission v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). Where the Federal District Court has jurisdiction by reason of an existing federal question, under the abstention doctrine if complainant has not exhausted his appeals on the

1. A petition entitled "Petition Raising New Matter and Question of Jurisdiction" was filed with the P.U.C. on October 4, 1965 and on October 11, 1965 another petition entitled "Petition for Hearing and Argument Raising New Matter and Question of Jurisdiction and Constitutionality of Order of October 4, 1965" was filed with the P.U.C. Both the October 4th and 11th petitions raised the preemption question. The complaint was filed in the District Court on October 13, 1965.

state level the District Court, depending on the particular circumstances, may refuse to dispose of the merits of the dispute until after the state courts have decided it. That discretionary abstention is based on the " * * * desirability of avoiding unseemly conflict between two sovereignties, the unnecessary impairment of state functions, and the premature determination of constitutional questions." Martin v. Creasy, 360 U.S. 219, 224, 79 S.Ct. 1034, 1037, 3 L.Ed.2d 1186 (1959).

■ From the facts before us a dismissal of this suit, on the authority of the abstention doctrine was not indicated. The order of the P.U.C. was dated April 13, 1964. An appeal was taken to the Superior Court of Pennsylvania which handed down its opinion on June 17, 1965, affirming the P.U.C. On July 6, 1965 appellant filed a petition with the P.U.C. requesting that the Commission modify its order of April 13, 1964 but it appears that the Commission did nothing. On October 4, 1965 appellant filed a petition with the P.U.C. entitled "Petition Raising New Matter and Question of Jurisdiction" and for the first time the allegations of federal occupation and preemption were injected into the litigation as a challenge to the order of the P.U.C. On October 11, 1965 appellant filed another petition asking for a hearing on the October 4th petition and again raising the preemption question. It appears that the Commission either denied or took no action on those petitions, although as noted by the District Court "the record is not clear on these points." 253 F.Supp. 50, 52. It was after that that appellant filed its complaint in the United States District Court for the Western District of Pennsylvania.

Appellant sought the aid of the District Court because it was evident that all efforts to raise the federal question on the state level had failed. It would have been futile for appellant to continue appeals in the courts of Pennsylvania since the very point it wishes to make (preemption) could not be heard because it had not been before the P.U.C. or the Superior Court. In the petitions of October 4th and 11th appellant made a good faith effort to bring the problem to the attention of the Commission and when that attempt failed appellant's sole remaining recourse was to the Federal Courts.

The District Judge felt that the power and authority of the P.U.C. should be tested by seeking an injunction in the Common Pleas Court of Dauphin County, Pennsylvania under 66 P.S. § 1441. However, the absence of a state remedy is not the sine qua non of federal jurisdiction in this instance. Admittedly there existed jurisdiction in both Commonwealth and Federal Courts but the choice was for appellant. If the latter had selected the Commonwealth Court it would probably have faced dismissal for failure to raise the federal question below. In Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382 (1909), the Court stated:

"When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction (Cohens v. Com. of Virginia, 6 Wheat. 264, 404, 5 L.Ed. 257, 291), and, in taking it, that court cannot be truthfully spoken of as precipitate in its conduct. That the case may be one of local interest only is entirely immaterial, so long as the parties are citizens of different states or a question is involved which, by law, brings the case within the jurisdiction of a Federal court. The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." (212 U.S. 19 at 40, 29 S.Ct. 192 at 195).

■ Abstention is not a rule of law but rather a matter of judicial discretion, Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The doctrine furnishes an alternate route of appeal through the state court system to the Supreme Court of the United States, but

where as clearly appears in this appeal the plaintiff is confronted with a serious block at the state level and lawfully asks relief in the Federal District Court, the cause should not be dismissed in reliance upon the abstention theory.

Because the substantive contentions of the litigants were thoroughly set out to and passed upon by the District Court, of necessity we must examine and dispose of the issues involved.

### THE HOT METAL MOVEMENT

■ The District Court found that the hot metal movement did not come within the provisions of Section 1 of the Safety Appliance Act, " * * * since the metal cars do not move in interstate traffic." 253 F.Supp. 50, 53. We agree with that conclusion. 45 U.S.C. Section 1 reads:

> "It shall be unlawful for any *common carrier engaged in interstate commerce by railroad* to use on its line any locomotive engine *in moving interstate traffic* not equipped with a power driving-wheel brake and appliances for operating the train-brake system, *or to run any train in such traffic* that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." (Emphasis supplied).

The fact that an interstate carrier is concerned does not of itself subject the carrier to the provisions of the Act; to be so governed, the carrier must also be "moving interstate traffic". This is precisely what Judge Dumbauld was speaking of when he held that the Act did not apply to the hot metal movement " * * * since the metal cars do not move in interstate traffic." The Act makes it unlawful for an interstate railroad carrier "to use on its line any locomotive engine in moving interstate traffic", or for the carrier "to run any train in such traffic" not equipped with the proper brakes. It follows that if the metal cars do not move in interstate

traffic the locomotive engine can not be "moving interstate traffic".

The statute deals with interstate railroad traffic and in no way can the hot metal operation be so classified. The movement is strictly local, confined to the industrial complex of the Jones & Laughlin Steel Company. The ladle cars are loaded with molten metal on the north side of the Monongahela River and journey to the open hearth furnaces on the south bank. In contrast, the hopper cars which go to make up the Talbot movement (which cars do move in interstate traffic), commence their journey in different parts of the country, eventually arriving within the State of Pennsylvania. The traffic comprising the hot metal movement has no interstate connection, it merely travels from one side of the river to the other. There is no doubt but that the Monongahela Connecting Railroad is engaged in interstate commerce but its hot metal movement is not within the purview of the Safety Appliance Act since it does not meet the further requirement Congress imposes.

■ We are also in agreement with the District Court that the hot metal movement is a train movement and not a switching operation. We accept its finding that "(t)he hot metal cars have not been received from other railroads in interchange, and have not had any prior or subsequent line-haul movement. The entire transportation service consists of a single, continuous movement from the blast furnaces to the open hearth furnaces. Such movement is not incident to the assembling or breaking up of a train about to move, or which has moved, in line-haul travel or in interstate commerce." 253 F.Supp. 50, 53. The distinction is of prime importance for the reason that the movement would be subject to 45 U.S.C. Section 1 if it were not for the fact that it is not "moving interstate traffic".

It is urged that the provisions of Section 1 of Title 45 U.S.C., relied upon by the District Court, have been amended by Sections 8 and 9 of Title 45 U.S.C.

148

Section 8 of Title 45 U.S.C. was amended in 1903 to read:

" * * * and the provisions and requirements relating to train brakes, automatic couplers, grab irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the Territories and the District of Columbia * * *." In 1958 Congress amended 45 U.S.C. § 9 to read:

" * * * *Provided, however,* * * * The provisions and requirements of this section shall apply to all trains, locomotives, tenders, cars, and similar vehicles used, hauled, or permitted to be used or hauled, by any railroad engaged in interstate commerce. * * * "

It is true that the cars of the hot metal movement are used on a railroad engaged in interstate commerce (Section 8), and that the requirements of Section 9 apply to vehicles used, or hauled by a railroad engaged in interstate commerce. If these were the only conditions attendant to enforcement of these sections the movement would be within federal authority. However, Section 1, including its provision that the cars move in interstate traffic, is incorporated into Sections 8 and 9. Section 1 has remained intact ever since its passage in 1893. The language thereof, "moving interstate traffic" would surely have been stricken from the section if Congress had intended the above quoted amendments to completely cover the area with which we are dealing.

▮ Appellant's hot metal movement is the sort of operation specifically excluded by Section 1. This leaves it subject to the regulatory orders of the Pennsylvania Public Utility Commission. Where federal legislation admits of a gap the state may pass appropriate laws, to take care of needed protection, which do not conflict with their federal counterparts, Atlantic Coast Line v. Georgia, 234 U.S. 280, 34 S.Ct. 829, 58 L.Ed. 1312 (1914); Terminal R. Assn. of St.

Louis v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943). The hot metal movement, because of its position in relation to the Safety Appliance Act and its extremely hazardous nature, comes within the sphere of appropriate state regulation. In Smith v. State of Alabama, 124 U.S. 465, 8 S.Ct. 564, 31 L.Ed. 508 (1888), the Court stated:

"It is to be remembered that railroads are not natural highways of trade and commerce. They are artificial creations; they are constructed within the territorial limits of a state, and by the authority of its laws, and ordinarily by means of corporations exercising their franchises by limited grants from the state. The places where they may be located, and the plans according to which they must be constructed, are prescribed by the legislation of the state. Their operation requires the use of instruments and agencies attended with special risks and dangers, the proper management of which involves peculiar knowledge, training, skill, and care. The safety of the public in person and property demands the use of specific guards and precautions. * * * The rules prescribed for their construction and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the limits of the local law. They are not per se regulations of commerce; it is only when they operate as such in the circumstances of their application, and conflict with the expressed or presumed will of congress exerted on the same subject, that they can be required to give way to the supreme authority of the constitution." (124 U.S. 465 at 481, 482, 8 S.Ct. at 570).

THE TALBOT MOVEMENT

▮ The District Court considered that the Talbot movement was a true switching operation and therefore exempt from regulation under the Safety Appliance Act. However, the Court found further that with regard to interstate movements Congress intended to occupy

the field, precluding any "exercise of State authority with respect to a genuine switching movement involving interstate commerce." 253 F.Supp. 50 at 54. Whether Congress intended such operations to flounder in the railway yards without the aid of any legislation, local or federal, is not necessary for our decision since we are convinced that the Talbot movement is a true train movement and subject to the provisions of the Safety Appliance Act.

The appellant railroad is engaged in interstate commerce and the hopper cars of its Talbot movement, which are shipped into Pennsylvania from various other states, move in interstate commerce. That movement does begin with some switching maneuvering but emerges as a valid train operation. The part of Talbot which has to do with the assembling of hopper cars on the north side of the river constitutes a switching type of collecting cars. But once the cars are brought together and the movement starts its journey across tracks utilized by other movements and finally across the Monongahela River, a navigable stream, it takes on every characteristic of a train movement. In United States v. Erie R. R. Co., 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019 (1915), the Court explained that " * * * a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision." 237 U.S. 402, 407, 408, 35 S.Ct. 621, 624.

The judgment of the District Court will be reversed and the appeal remanded to the District Court for the entry of judgment that: (1) plaintiff's hot metal movement, as at present constituted, does not come within Section 1 of the Federal Safety Appliance Act, 45 U.S.C. and is within the jurisdiction of the Pennsylvania Public Utility Commission, and (2) plaintiff's Talbot movement, as at present constituted, is a train movement and subject to the authority of the said Federal Safety Appliance Act.